LIBRARY NEIGHBORHOOD ASS'N v. GOOSEN.

1. COVENANTS—BUILDING RESTRICTIONS—DEED CONSTRUED.

The language contained in a deed to certain lots in a certain district requiring the grantee, his heirs, and assigns to erect a single dwelling house of stone or brick to cost not less than a certain amount, when construed in connection with the fact that deeds to all of the lots in said district contained similar language, and in view of all the surrounding circumstances, *held*, to create a restriction binding against subsequent grantees limiting the use of the property in said district to single residences.[1]

2. SAME—NOTICE.

In a suit to restrain defendant from erecting an apartment house on lots in a district claimed by plaintiffs to be restricted to single residences, where defendant had actual notice of said claimed restrictions he could not rely on the fact that the recorded plat contained no such restrictions, and that the language of his deed was insufficient to give him notice of such restrictions.[2] CLARK, C. J., and BIRD and SHARPE, JJ., dissenting.

3. SAME—CHANGE IN CHARACTER OF DISTRICT.

The finding of the court below that there have been no changes of a sufficiently serious character in said district to render the enforcement of the restriction inequitable, *held*, correct.[3]

Appeal from Wayne; Collingwood (Charles B.), J., presiding. Submitted October 24, 1924. (Docket No. 152.) Decided December 10, 1924. Rehearing denied April 3, 1925.

Bill by the Library Neighborhood Association and others against Henry J. Goosen to enjoin the violation of building restrictions. From a decree dismissing the bill, plaintiffs appeal. Reversed, and decree entered for plaintiffs.

---

[1]Deeds, 18 C. J. §§ 450, 459; [2]Id., 18 C. J. § 463; [3]Id., 18 C. J. § 465.

The question as to who may enforce restrictive covenant or agreement as to use of property is discussed in notes in 37 L. R. A. (N. S.) 12; L. R. A. 1917A, 328.

*Yerkes, Simons & Goddard,* for plaintiffs.

*Frank C. Cook* and *John P. O'Hara,* for defendant.

McDONALD, J.    The plaintiffs seek to enjoin the erection of a 10-story apartment building on certain lots in the city of Detroit, which they say are restricted to single residences.    The district in which the lots are located is bounded on the west by Second avenue, on the east by Cass avenue, on the north by Kirby avenue, and on the south by Warren avenue.    It comprises three city blocks, 3, 4, and 5 of the Cass Farm subdivision.    It contains 78 lots, all of which have been sold and on all nothing but single residences have been erected.    The defendant has leased lots 3, 4, 5, and 6 of block 4 and intends to tear down the residences that have been built thereon and build a 10-story apartment with 200 rooms and 17 garages in the rear.    The recorded plat contains no restrictions. Lot 3 and the south 25 feet of lot 4 are owned by Ralph Stone.    His deed contains the following building covenant:

"It is a condition of this conveyance that the second party, his heirs and assigns, shall erect on said lots and complete a good and well built single dwelling house of stone or brick, worth not less than $6,000, placing the same 25 feet from the front line of said lots and upon the grade of said block as the same shall have been established by the party of the first part."

The deeds of lots 5 and 6 and the northerly 25 feet of lot 4, now owned by James M. Teahen, contain similar restrictions.    It is the claim of the defendant that the language of the restrictive clauses in these deeds does not create a restriction, but that it is merely a personal affirmative covenant imposed upon the grantee for the benefit of the original grantor; that it cannot be enforced against subsequent grantees; and that if the language of the deeds can be said to

restrict the use of the property to single residences, the conditions on Cass avenue have so changed as to render it unjust and inequitable to enforce the restriction.   On the hearing the circuit judge was of the opinion that the language of the deeds did not create a restriction as to single residences.   From the decree entered dismissing the bill the plaintiffs have appealed.

The restriction in question is unusual in that it merely requires the grantee to perform an affirmative covenant, to build a certain type of single residence, and that it does not in express terms prohibit the erection of apartment houses or other buildings.   If we were to consider only the precise language of the covenant, we might agree with the contention of the defendant, but under the circumstances of this case the rights of the parties are not to be determined by a literal interpretation of the restriction.   It is to be construed in connection with the surrounding circumstances, which the parties are supposed to have had in mind at the time they made it, the location and character of the entire tract of land, the purpose of the restriction, whether it was for the sole benefit of the grantor or for the benefit of the grantee and subsequent purchasers, and whether it was in pursuance of a general building plan for the development and improvement of the property.   If there was a general building scheme the purpose of which was to restrict this district to single residences, it matters not how it is expressed in the covenant or what the covenant may be called.   However, so far as the purpose is definitely stated in the covenant that purpose should control.   In this case the covenant requires the building of single residences of a certain type, but is indefinite as to the time the land shall be used for that purpose.   It does not state how long the required building shall be maintained.   If a grantee of a deed containing this covenant complies

with the requirement and builds a single residence of
stone or brick, placing it 25 feet from the front line
of the lot, can he tear it down the next day and build
a store or garage covering the entire lot, or is he
limited in the use of the property to a single residence?
This question cannot be answered by a literal inter-
pretation of the covenant. We must look to the sur-
rounding circumstances to discover the intention of
the parties and the purpose of the original grantor
in imposing the restriction.

"In dealing with this subject, equity does not concern
itself with the forms of the language in which the
restriction is couched, but deals only with its sub-
stance. It disregards the inquiry whether it is a
condition or a covenant, and enforces it when it was
plainly intended by the parties that it should be for the
benefit of the land held by the plaintiff." *Coughlin*
v. *Barker*, 46 Mo. App. 54, 64, cited in note to *Korn*
v. *Campbell*, 37 L. R. A. (N. S.) 18 (192 N. Y. 490,
85 N. E. 687).

"It is always a question of the intention of the
parties; and in order to make this rule applicable, it
must appear from the terms of the grant, or from the
situation and surrounding circumstances, that it was
the intention of the grantor in inserting the restric-
tion to create a servitude or right which should inure
to the benefit of the plaintiff's land, and should be
annexed to it as an appurtenance." *Beals* v. *Case*,
138 Mass. 138.

"In cases of this kind it is important to ascertain
the purposes of the grantor in imposing the restric-
tions,—whether they are intended for his personal
benefit, or for the benefit of the lot owners generally.
His intention is to be gathered from his acts and the
circumstances." *Hano* v. *Bigelow*, 155 Mass. 341
(29 N. E. 628).

What, then, was the intention of the Cass Farm
Company in incorporating these restrictions in its
contracts and deeds? The lots upon which the de-
fendant proposes to build his apartment house are in

block 4 and front on Cass avenue.   In the same year that the land was platted, 1893, lot 22 of block 4 was sold on contract to Mr. Butterfield.   It was the first sale made with a restriction and was one of the first, if not the first, sale made in this district.   The contract contained a similar restriction to that here in question and further provided:

"First party agrees that all contracts made by it for the sale of other lots in said block shall be made with similar restrictions as are herein contained."

From this it appears that restrictions were placed in the contracts of the various purchasers in pursuance of an agreement with Mr. Butterfield.   It was a consideration of his purchase.   He evidently did not want to buy and build his home there unless the district was limited to single residences, and so he required the original grantor to enter into an agreement providing a general building plan for the building of single residences of stone or brick on all lots subsequently sold.   It may be said that this restriction provided a readier sale of the remaining lots and was therefore for the grantor's benefit.   But it was also for the benefit of the land bought by Mr. Butterfield, and the fact that it brought about a readier sale of the balance of the tract shows that it was also a benefit to subsequent purchasers.   The circumstances and the acts of the original grantor show that such was the intention.   Following the agreement with Mr. Butterfield the plan adopted was consistently followed over a long period of years, except in two or three instances where houses of the character described in the covenant had already been erected. The fact that such a building plan had been adopted was well understood and generally relied upon by subsequent purchasers.   The construction placed upon it by all parties was that nothing but single residences could be built.   And nothing but single residences

have been built. The various purchasers complied with the restriction as they understood it. They have built up a high-class single residence district, following the building plan adopted by the original grantor. The circuit judge, who heard the testimony and made a personal inspection of the three blocks in question, says:

"These three blocks now stand out and impress an observer as constituting a strictly high-class single residence district. * * *
"Cass avenue between Warren and Kirby presents the appearance of a splendid residence street. On the east side is the beautiful public library building set in a well kept park. On either side stately elm trees. On the west side are a number of beautiful residences in ample, if not spacious grounds, and ranging in value up to $150,000." * * *

A further significant fact showing the intention of the original grantor and the practical construction given the restriction is disclosed by an attempt to enforce it on lot 1 of block 3. In the bill of complaint filed by the Cass Farm Company, it was alleged:

"That it then was, and ever since has continued to be, the purpose and intention of said Cass Farm Company, Limited, and its successor in title, to make said block 3 and other portions of the subdivision aforesaid, a high-class, exclusive residence property, and to that end it provided and maintained certain building restrictions in the contracts, deeds and conveyances thereafter made by it; which building restrictions are more specifically described hereafter; the general scheme of which was to require all the property in said block, so far as it was occupied by buildings, to be exclusively residence property containing nothing but single dwelling houses of stone or brick, costing not less than six thousand dollars and placed upon an established grade not less than twenty-five feet from the front line of the lots."

Mr. Ferrell, who had charge of the real estate business of the Cass Farm Company for 29 years, during

which time this property was developed, testified that
the purpose of incorporating the restrictions in the
contracts and deeds to the lots in the three blocks
comprising the district in question was to make of it
a high-class single residence district.   And it will
be noted that these contracts and deeds containing
similar restrictions were not given at or about the
same time, but at intervals covering a period of
years, a fact which shows not only a general building
plan, but that it was being consistently followed and
maintained.   By maintaining the restriction through
this long period it may fairly be inferred that the
original grantor intended it to apply not alone to the
first building but to all future use of the property.
For if it was not continued beyond the time of the
completion of the first dwelling the grantee could then
tear it down and erect a store or other building that
would destroy the single residence feature of the plan,
and thus defeat the purpose of the grantor.   It is
plain that such was not the intention.   The only
reasonable conclusion that can be adduced from the
circumstances under which the restriction was im-
posed and from the subsequent acts of the original
grantor is that the restriction was intended to apply
to all future use of the property.   It was so under-
stood by those who became purchasers of lots after
the agreement with Mr. Butterfield.   They bought
their lots and built their homes in reliance on it.   It
was a part of the consideration of their purchase.   It
was exacted of all purchasers for their benefit as well
as for the benefit of the grantor.   It induced the
purchase and has created mutual reciprocal rights
which a court of equity is bound to recognize and en-
force.   These facts distinguish the instant case from
*Hurley* v. *Brown,* 44 App. Div. 480 (60 N. Y. Supp.
846), cited and relied on by the defendant.   In that
case it does not appear that the restriction was made
in pursuance of any general building plan and there

was nothing in the circumstances under which it was imposed showing that it was for the benefit of subsequent purchasers.

"The right of grantees from a common grantor to enforce, *inter se,* covenants entered into by each with said grantor, is confined to cases where there has been proof of a general plan or scheme for the improvement of the property, and its subsequent benefit, and the covenant has been entered into as part of a general plan to be exacted from all purchasers, and to be for the benefit of each purchaser, and the party has bought with reference to such general plan or scheme and the covenant has entered into the consideration of his purchase." *Mulligan* v. *Jordan,* 50 N. J. Eq. 363 (24 Atl. 543).

In our view of the case, the covenant in question construed in connection with the surrounding circumstances creates a valid restriction limiting the use of the property in this district to single residences.

It is said that there is nothing in the recorded plat that would charge the defendant with notice of building restrictions such as the plaintiffs claim, and that the language of the deeds is not sufficient notice of such restrictions; but this is not a case where the defendant has purchased lots or made a lease relying on the precise language of the restrictive covenants of the recorded deeds.    He was familiar with the property and the restrictions as is evidenced by his oral testimony and by the agreement which he made with the owners for a lease of the lots on which he intends to build the apartment.    This agreement provides that the lease will not be made unless he succeeds in having the alleged building restrictions set aside.

We agree with the circuit judge that there have been no changes of a sufficiently serious character to render the enforcement of the covenant inequitable, but we think he was in error in his view of the character and the extent of the restrictions.

A decree will be entered in this court granting the relief prayed for in the bill. The plaintiffs will have costs.

MOORE, STEERE, FELLOWS, and WIEST. JJ., concurred with McDONALD, J.

CLARK, C. J. (*dissenting.*). The circuit judge was right in holding the language to be a condition and not a restriction.

The decree should be affirmed, with costs to appellee.

BIRD and SHARPE, JJ., concurred with CLARK, C. J.