# MING KUEI LIU ET UX. v. GERALD J. DUNNIGAN ET AL.

[No. 507, September Term, 1974.]

*Decided March 13, 1975.*

The cause was argued before THOMPSON, MENCHINE and MELVIN, JJ.

*Richard B. Talkin,* with whom were *Talkin & Abramson* and *Israel Drazin* on the brief, for appellants.

*James B. Dudley* for appellees.

THOMPSON, J., delivered the opinion of the Court.

The complainants-appellees filed suit in the Circuit Court for Howard County to enjoin the appellant, Dr. Ming Kieu Liu, from using a part of his residence as a doctor's office. From a decree granting the injunction, appellant has brought this appeal. The determination of the correctness of that decree hinges on the applicability and meaning of a restrictive covenant contained in a deed from a common grantor of the land of appellant and appellees.

The record shows that early in 1953 John David Engineering Corporation conveyed approximately 70.64 acres of land in Howard County to Wesley Johnson. Johnson and his wife conveyed the subject land to Frank T. Kline and

180

his wife by deed dated June 10, 1953. The fifth WHEREAS clause of that deed provides:

> "*WHEREAS*, the said parties of the second part [Klines] have purchased certain of said lots and are desirous of cooperating with the developer [Johnsons] for the purpose of making the covenants, agreements, easements and restrictions hereinafter set forth binding alike upon the developer, his heirs and assigns, and the said parties of the second part, their assigns, the survivor of them, his, or her, heirs and assigns, as well as upon all the land included in said tract and designated as the ninety-four residential lots aforesaid; and,"

The deed imposed several restrictive covenants on the land in the following language:

> ". . . and further subject, however, to and with the benefit of the following covenants, agreements, easements and restrictions, which it is hereby covenanted and agreed shall be binding upon the said developer, his heirs and assigns, and upon the said parties of the second part, their assigns, the survivor of them, his, or her, heirs and assigns, and upon all the land included in said tract hereby conveyed, that is to say:
>
> "(1) All the lots in said subdivision, as shown on said plat, or plats, except the block marked 'Commercial, Subject to Applicable Zoning Regulations', and heretofore reserved from the operation and effect of this deed and agreement, and which is designed for business or residential purposes, shall be known and described as residential lots and are so referred to hereinafter, and shall be used exclusively for private dwelling house purposes only and no structure shall be erected on said residential building lots other than a one-family dwelling and a one, or two, car garage

for the sole use of the respective owners, or occupants, of the lots upon which such garages are erected.

\* \* \*

"(7) The herein enumerated restrictions shall be deemed as covenants and not as conditions hereof, and shall run with the land and bind the parties hereto, their heirs and assigns, and all parties and persons claiming by, from, or under them, and upon all the land included in said subdivision, except where not applicable to the aforesaid business lots.

"(8) If the parties hereto, or any of them, their heirs or assigns, shall violate, or attempt to violate any of the aforementioned covenants or restrictions, it shall be lawful for any other party, person or persons owning any other lot in said subdivision to prosecute any proceeding at law, or in Equity, against the party, person, or persons violating, or attempting to violate any such covenant or restriction, and either to prevent him, or them, from so doing, or to recover damages or other dues for such violation."

The Klines immediately reconveyed the subject land to the Johnsons except for 3 lots which are not involved in the instant case.

On August 8, 1957, Johnson conveyed by deed 17.66 acres of the above-mentioned 70.64 acres to the Hamilton Heights Construction Company. Hamilton Heights conveyed the 17.66 acre plot to Nob Hill Incorporated by deed dated April 3, 1961. 4.994 acres of that land were then conveyed by Nob Hill to William Robinson and his wife by deed dated June 9, 1971. On August 16, 1972, the Robinsons conveyed by deed a lot which was part of the aforementioned 4.994 acres to the appellants. On June 20, 1972, the Robinsons conveyed another portion of the 4.994 acres to Robert W. McColley and his wife, two of the appellees.

None of the above-mentioned deeds, including appellants', made reference to the restrictive covenants except of course for the original deed from the Johnsons to the Klines.[1] Appellants' sales contract however did contain the following pre-printed verbiage:

> "AND upon payment as above provided of the unpaid purchase money, a deed for the property containing covenants of special warranty and further assurance shall be executed at the Buyer's expense by the Seller, which shall convey the property to the Buyer. Title to be good and merchantable, free of liens ·and encumbrances except as specified herein and except: *Use and occupancy restrictions of public record which are generally applicable to properties in the immediate neighborhood or the sub-division in which the property is located, and publicly recorded easements for public utilities and any other easements which may be observed by an inspection of the property, and assessment for sewer and water benefits.*" (Italics added).

All of the above-mentioned deeds were properly recorded in the land records office of Howard County.

An attorney, who was accepted by the court as an expert on title searching, testified that, in his opinion, the restrictive covenants contained in the 1953 deed from the Johnsons to the Klines bound the land of appellants and appellees.

The real estate agent who sold appellants their house testified that Dr. Liu requested numerous structural changes be made to the interior of the house but that he never mentioned his intention to use the house as a professional office in addition to its use as a residence. The

---

1. The deeds from the Robinsons to the rest of the appellees were subsequently introduced. Of those 10 deeds only 3 mention restrictions. They do so in the following manner: "ALSO being subject to the legal operation and effect of the restrictions and/or easements of record, if any."

agent also stated that despite the changes the house still looked like a dwelling, architecturally.

Robert W. McColley, who along with his wife comprised one of the eleven couples who brought suit, testified that he had purchased his home in November 1971 and had moved in during June 1972 prior to appellants. Subsequently McColley spoke with Dr. Lui who told him that he intended "to open up his own office." Due to a language problem McColley said he had no idea Dr. Liu intended to set up an office in his residence. With regard to the reason for appellees' suit, McColley testified as follows:

> "Well, it's the feeling that I have and also my wife's that it does represent a parking problem, a safety hazard, that we and our neighbors have invested a considerable amount of money to reside on that street with the understanding that this was a strictly residential area, that there was not to be any commercialism, which I would say this represents with the signs in the front; the safety hazard, because it's a deadend street and the children play out in the street and they're all at various ages, the traffic problem which this would constitute."

Dr. Liu testified that he spoke with the real estate agent and Mr. Robinson about his plans to use part of his house as an office and that they voiced no disapproval. Liu also said he spoke with the mortgagee and the Howard County Zoning authorities regarding his office and they said that there was no problem. He also spoke with a Dr. Reeves, a dentist in the neighborhood. Reeves had been practicing for some time from an office in his home. In that regard a stipulation was entered into between attorneys for all the parties and was read into the record:

> "It is hereby stipulated and agreed between counsel for the Plaintiffs and counsel for the Defendants, that if Francis Reeves were called to testify, Mr. Reeves would testify that in 1962 he contracted

with Development Sales Corporation for the construction and purchase of a dwelling house at 9539 Westwood Drive, Ellicott City, which was to contain offices for the practice of dentistry. Mr. Reeves has resided at this address since the home was completed in 1963, and has regularly practiced dentistry at this address on Tuesdays and Thursdays only. While Dr. Reeves does not maintain a principal office for dentistry elsewhere, he is the chief dentist at Spring Grove Hospital and the University of Maryland Hospital and the Children's Hospital. *It is also stipulated that the property of Dr. Reeves is one of those lots originally included in the property of Wesley L. Johnson and wife, to which the restrictive covenants in question apply, as well as, those of each of the Plaintiffs and the Defendants.* Dr. Reeves' office is identifiable by a sign outside the premises.

"It is further stipulated that the telephone directory lists one phone number and address for Dr. Reeves' office and that is 9539 Westwood Drive." (Italics added).

According to Dr. Liu the dispute with his neighbors over the office arose some time in June 1973, shortly before the instant suit was filed. He also stated that since that time he had spent over $9,000 on his office to bring the total cost to approximately $15,000. Liu finally added that he had given up his office in Baltimore City to move to Howard County and that at the time he had no office other than at his home.

## APPLICABILITY OF THE COVENANTS

The threshold question presented by this appeal is whether the restrictive covenants in the 1953 deed from the Johnsons to the Klines apply to the parties.

Appellants advance several arguments in support of their contention that the covenants in question do not apply. In light of the stipulation entered into between appellants' attorney and the attorney for the appellees in which all

parties agreed that the restrictive covenants in question applied to their land we need not discuss all of the specific points raised by the appellants.

We note, however, that the trial court's conclusion that the covenants ran with the land and therefore applied to the appellants is well supported by the cases. Regarding the nature of the restrictive covenant, the Court of Appeals in *Gnau v. Kinlein,* 217 Md. 43, 141 A. 2d 492 (1958) stated at 48:

> "Whether a restrictive covenant is personal to a grantee or a grantor, or to both, or binds their respective successors in title, and so the land by whomever owned from time to time, as well as whether a grantor intended to bind land retained by him, is a question of intention, which may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent. *Schlicht v. Wengert,* 178 Md. 629; *Club Manor v. Oheb Shalom Cong.,* 211 Md. 465, 475-476; *Halle v. Newbold,* 69 Md. 265; *Turner v. Brocato,* 206 Md. 336; *Oak Lane Corporation v. Duke,* 196 Md. 136.

It is clear to us from the language of the 1953 deed that the Johnsons' intent was to bind not only themselves and the Klines by the restrictive covenants imposed, but also all subsequent purchasers of the land or any part thereof. The language is susceptible of no other reasonable interpretation.

The fact that the deed to appellants did not contain a reference to the covenants does not alter their effect. The 1953 deed containing the covenants was properly recorded and as such provided constructive notice to the appellants and therefore the covenants are binding against them. *Gnau v. Kinlein, supra* at 49; *Lowes v. Carter,* 124 Md. 678, 685-86, 93 A. 216 (1915).

Appellant contended on oral argument that we should not accept the stipulation because the trial judge did not refer to

it in his opinion, but relied on the deeds in evidence and on the title searcher's opinion that the restrictions bound all of the property of the parties hereto. The argument is specious.[2] There is no indication in the record that the stipulation was rejected by the court.

## THE MEANING OF THE COVENANTS

The restrictive covenant whose meaning concerns us here is found in the deed dated June 10, 1953 from the Johnsons to the Klines and reads as follows:

> ". . . and further subject, however, to and with the benefit of the following covenants, agreements, easements and restrictions, which it is hereby covenanted and agreed shall be binding upon the said developer, his heirs and assigns, and upon the said parties of the second part, their assigns, the survivor of them, his, or her, heirs and assigns, and upon all the land included in said tract hereby conveyed, that is to say:

> "(1) All the lots in said subdivision, as shown on said plat, or plats, except the block marked 'Commercial, Subject to Applicable Zoning Regulations', and heretofore reserved from the operation and effect of this deed and agreement, and which is designed for business or residential purposes, shall be known and described as residential lots and are so referred to hereinafter, and *shall be used exclusively for private dwelling house purposes only* and no structure shall be erected on said residential building lots other than a one-family dwelling and a one, or two, car garage for the sole use of the respective owners, or occupants, of the lots upon which such garages are erected." (Italics added).

---

2. The deed dated June 10, 1953, from the Johnsons to the Klines in imposing the restrictions recited that the commercial part was a strip along Route 40. This is sufficient, without the introduction of the plat, to show appellants' property was not a part of the land exempted from the residential restrictions because the appellants' lot is not along Route 40.

Appellants argue that the covenant does not prohibit the use of part of their home as a doctor's office so long as the outward appearance of the home remains the same and so long as "there is no laboratory, hospital, associate physicians, secretaries, nurses, technicians or some such facilities or assistance" on the premises.

In *Osborne v. Talbot*, 197 Md. 105, 78 A. 2d 205 (1951), a chiropractor was enjoined by the lower court from "conducting or engaging in any business or profession" in his home because of a restrictive covenant similar to the one in the instant case. The facts disclosed that Osborne's principal office was not in his home and that his practice at home was to be limited and incidental to his main office. The Court of Appeals reversed the decree granting the injunction holding that the meaning of "residential purposes only" was not so narrow as to preclude the "incidental" practice of chiropractic in a home. The Court added, however, that:

> "If defendant should abandon his present office and remove it to his residence, there is not sufficient evidence, as to how the present office is conducted, to enable us to determine whether or not such an office at the residence would violate the covenants. Our decision will be without prejudice to further proceedings in this case or a new case, if and when such a change is made or threatened and plaintiffs are in a position to show the material facts." *Id.* at 118.

Such further proceedings did arise. After the court's decision, Osborne closed his main office and began practicing his profession actively and exclusively at his residence. He had no other office and no other vocation. He had office hours five days and two nights a week. He employed a nurse, had two telephones—one listed as residential, one as a business number. He had several pieces of electrical equipment installed. The office contained four booths and there was a small sign outside with the words "Doctor's Office" and an arrow on it. There also was evidence that on several specific dates numerous patients

were seen by Osborne in his home. As a result of this change, several neighbors sued to enjoin Osborne under the aforementioned restrictive covenants. The chancellor denied the injunction and the complainants appealed. The Court of Appeals in *Wells v. Osborne*, 204 Md. 375, 104 A. 2d 599 (1954) reversed the chancellor and held with regard to Osborne's activities:

> "We think these activities overstep the bounds and violate the covenant. While there is evidence that the practice is not as large as at the Broadway office, and that office hours are not as long, it cannot be described as incidental in any sense. It is the primary and exclusive use to which his training and talents are applied. Nor is it incidental in the sense of occasional, as in the case of a retired physician accepting calls from a few patients, or an active practitioner acting out of usual office hours in urgent or emergency cases."
>
> * * *
>
> "We suggest that the decree should be modified to enjoin the defendant from the regular use of the premises for the practice of his profession, except as incidental or supplemental to an office elsewhere, or occasionally or in emergencies. His present activities must be discontinued." *Id.* at 378, 379.

In *Grubb v. Guilford Association, Inc.*, 228 Md. 135, 178 A. 2d 886 (1962), the Court dealt with a similar restrictive covenant. Dr. Grubb converted the basement of his Greenway home into a doctor's office, consisting of a hall, a waiting room, an isolation room and an office. The office was equipped with customary medical implements. He employed a receptionist-secretary, who worked from nine to five. He saw, by appointment, an average of eight patients on each of four mornings a week. On those four mornings his office hours were from 9:30 a.m. to 1:00 p.m. He occasionally saw patients on Wednesday afternoon and Saturday morning. There was evidence that on several occasions he

saw as many as fifteen patients. The telephone listing for Dr. Grubb's office was 3607 Greenway (his home). He occasionally gave injections to patients at his old office. On the basis of these facts the Court, relying on the tests laid down in *Osborne v. Talbot, supra* and *Wells v. Osborne, supra,* concluded that the use of Grubb's house as the regular and main office of an actively practicing doctor violated the covenant restricting its use to residential purposes.

In the case at bar Dr. Liu testified that he had moved his office from Baltimore City to his home. He made extensive renovations in his home to convert part of it to an office. While he had no regular employees at the time of trial, he did have a nurse who came about once a week. His practice at the time of trial was minimal due to the uncertainty caused by appellees' suit. Applying the rationale of the Court of Appeals in *Osborne, Wells* and *Grubb* we conclude that Dr. Liu's activity violated the restrictive covenant. Dr. Liu's sole and exclusive office for the practice of medicine is in his home. He testified that in response to his neighbors' concern over the potential traffic problem his office could create, he had assured them that if necessary he would construct a parking lot on his lawn to accommodate his patients. We recognize that Dr. Liu's practice is not as yet as extensive as those in *Grubb* and *Wells* but we do not find that to be crucial. What is determinative in our view is the undisputed fact that Dr. Liu's only office is in his home.

Despite our holding, we hasten to add that Dr. Liu may not be completely prohibited from seeing any patients at his home. He may do so only if it is "incidental or supplemental to an office elsewhere or occasionally or in emergencies." *Wells v. Osborne, supra* at 379.

In that regard, we find, as the Court of Appeals did in *Osborne v. Talbot, supra* at 111, that the injunction granted by the lower court which prohibited the appellants from using their home "for other than private dwelling house purposes" was too broad and should be clarified.

We, therefore, will modify the decree to prohibit Dr. Liu

from only the regular use of his home for the practice of medicine, except as incidental or supplemental to an office elsewhere, or occasionally or in emergencies.

Appellants also argue that the reference to zoning regulations in the 1953 deed creating the covenants, which regulations permitted professional offices in homes provided no exterior changes to the homes are made, show an intent on the part of the Johnsons and the Klines to allow such offices. The argument overlooks the very language of the covenant in question which imposed the restrictions on "All the lots in said subdivision . . . , *except the block marked 'Commercial, subject to applicable zoning regulations.'* " This is the only reference in the covenant to zoning regulations. It is clear that the original parties were cognizant of the zoning regulations and that they intended to have them apply only to the section of the subdivision labeled "Commercial." It follows that if they had intended to define "private dwelling house purposes" as used in the covenants in the wider terms allowed by the zoning regulations they would have specifically done so.

The appellants' final argument with regard to the covenant's meaning is that the restriction prohibits business or commercial activities as opposed to professional activities. In light of *Osborne v. Talbot, supra, Wells v. Osborne, supra* and *Grubb v. Guilford Association, Inc., supra,* this contention is without substance.

The appellants cite a number of out of state cases holding a "use" covenant will not be implied where the covenant relates only to the type of structure. Those cases are inapposite because the language in the instant case expressly prohibits uses other than "for private dwelling house purposes."

## LACHES — ESTOPPEL

It was stipulated that a Doctor Reeves lives in the area covered by the restrictive covenant; that he has maintained a dental practice in his home since 1963; and that he does not

maintain a principal office elsewhere.[3] Appellants contend that the appellees waived their right to enforce the covenants by not objecting to the dental practice of Dr. Reeves.

The claim that the covenants are unenforceable against appellants because of the appellees' acquiescence to the apparent violations of the covenants by Dr. Reeves is not well founded. The defense of acquiescence was discussed in *Kirkley v. Seipelt*, 212 Md. 127, 128 A. 2d 430 (1957). In that case a restrictive covenant applicable to the parties' land provided that no building could be built or altered unless approved by a local neighborhood association. The appellant attempted to install a metal awning over her front porch. Several neighbors sued to enjoin her and an injunction was granted. Appellant claimed that the appellees had waived their right to enforce the covenants by not objecting to the installation of several similar awnings by other persons in the development.

The Court quoted with approval the general rule regarding acquiescence and waiver as stated in *Tiffany on Real Property*, (Abridged Ed. 1940) § 587:

> " '. . . if the Plaintiff has been guilty of laches or acquiescence in defendant's violation of, or has made equal or worse encroachments on [the restrictive covenant], it will not be enforced.' " *Kirkley v. Seipelt, supra* at 135.

The Court held that the allowance of several violations in a large development could in no way be considered an abandonment of the purpose for the existence of the covenants. With regard to appellants' claim of waiver by acquiescence the Court said, at 136:

> "There is no proof of laches, or acquiescence in appellant's intended violation of the covenant. In fact, she has never installed the same and acquiescence to be a defense must be acquiescence

---

3. It does appear that he was employed elsewhere.

> in appellant's conduct, not that of others. Acquiescence in the actions of others may bear upon the question of abandonment, but not upon the defense of acquiescence as we are now considering it; and, in order to constitute a defense, it must amount to an estoppel. *Schlicht v. Wengert, supra.*"

The same rule was applied in *Schlicht v. Wengert,* 178 Md. 629, 15 A. 2d 911 (1940). There a restrictive covenant prohibited the sale of liquor. Appellants unsuccessfully attempted to enjoin the operation of a tavern near their home. Evidence showed that appellants had signed, as character witnesses, the liquor license application of one Rinehart who thereupon sold liquor in the area. In reversing the lower court, the Court of Appeals found that appellants were not estopped to complain regarding appellee's conduct by their acquiescence to Reinhart's activities. The Court stated, at 637:

> "The endorsement of Rinehart's character, to aid him in securing a license for the sale of liquors, however it might prevent objection to the selling so licensed, would not work an estoppel against the enforcement of the covenant of the Wengerts."

In the case at bar the possible violation by Dr. Reeves was the only one shown to have occurred in all of the many acres covered by the covenants. As in *Kirkley v. Seipelt, supra,* we find such a minor violation in so great an area in no way shows that the appellees were giving up their rights to enforce the restrictive covenant. More importantly, as in *Kirkley* and *Schlicht,* any acquiescence by the appellees to the violation of the covenants was not directed to the actions of the appellants but rather to the actions of Dr. Reeves. Therefore, neither the defense of laches, acquiescence nor waiver is available to appellants.

## THE DOCTRINE OF COMPARATIVE HARDSHIP

Invoking the doctrine of comparative hardship, appellants

contend the injunction should not have been granted because if Dr. Liu is prevented from practicing medicine in his home appellants will suffer great hardship when they have caused only negligible harm to appellees.

The equitable doctrine of comparative hardship has been adopted in Maryland. *Grant v. Katson*, 261 Md. 112, 274 A. 2d 88 (1971); *Dundalk Holding Co. v. Easter*, 215 Md. 549, 555-557, 137 A. 2d 667, *cert. denied*, 358 U. S. 821, rehearing denied 358 U. S. 901 (1958). It was described succinctly in *Chevy Chase Village v. Jaggers*, 261 Md. 309, 320, 275 A. 2d 167 (1971):

> "It basically provides that a court may decline to issue an injunction where the hardship and inconvenience which would result from the injunction is greatly disproportionate to the harm to be remedied. Innocent mistake on the part of the party to be enjoined is a factor to be considered in applying the doctrine. Overlooking the fact that the doctor, though a mediate purchaser whose deed only made reference to the restrictive covenants in his predecessor's deed, should have been aware of the limits on the use of his property, we do not think he can invoke the doctrine by characterizing the potential harm that might result to his neighbors' homes as comparatively negligible. Their interest in preserving the residential integrity of their community is simply not outweighed by his desire to move to another fashionable and exclusively residential area."

We conclude that the doctrine has no application to the case at bar. Here Dr. Liu testified that he had spent approximately $15,000 to establish his office. $6,000 of that total was expended prior to June 1973 which was the first time he admitted being aware that appellees were opposed to his home practice. After being so informed, Dr. Liu spent an additional $9,000 on his office apparently without regard for the possible legal validity of appellees' position. The appellees' substantial interest in preserving the residential

194

■

integrity of their community is not outweighed by appellants' desire to establish a practice in his home.

## MODIFICATION OF DECREE

As discussed above we modify the decree by striking the phrase "for other than dwelling house purposes" and inserting in its place "for the regular practice of medicine, except as incidental or supplemental to an office elsewhere, or occasionally or in emergencies; and from maintaining a professional or business sign on the premises." Md. Rule 1075 b.

*Decree modified, and as modified affirmed.*
*Appellants to pay the costs.*